### In re Gary Wayne CLAUSEL and Debbie Jean Clausel, Debtors in Chapter 13.

### Bankruptcy No. 82–23241.

United States Bankruptcy Court,
W.D. Tennessee, W.D.

Aug. 29, 1983.

A.J. Calhoun, Memphis, Tenn., for Chapter 13 trustee.

George W. Stevenson, Memphis, Tenn., Chapter 13 trustee.

Philip F. Counce, Memphis, Tenn., for debtors.

Gary L. Jewel, Memphis, Tenn., for Midland Bank & Trust Co. (formerly Memphis Bank & Trust Co., Inc.)

## MEMORANDUM OPINION AND ORDER

WILLIAM B. LEFFLER, Bankruptcy Judge.

The debtors, Gary Wayne Clausel and Debbie Jean Clausel, filed a Chapter 13 Petition on September 17, 1982, and listed Memphis Bank & Trust Company (hereinafter "MB & T" in their petition as a secured creditor.

The debtors on May 31, 1979, executed an Installment Sale Contract and Security Agreement with Tom Bell Chevrolet Company for the purchase of a new 1979 Chevrolet pickup truck. The contract was then assigned to MB & T on May 31, 1979, and MB & T's lien was noted on a Tennessee Certificate of Title. The debtors agreed to pay 48 monthly installments of $227.52 each, commencing July 15, 1979.

The transaction is further summarized as follows:

| | | |
|---|---|---|
| Cash Price | | $ 7,412.70 |
| Down Payment | | (750.00) |
| Unpaid Balance of Cash Price | | $ 6,662.70 |
| Other Charges | | |
| (1) Physical Damage Insurance | $ 535.00 | |
| (2) Credit Life Insurance | 327.63 | |
| (3) Accident & Health Insurance | 451.04 | |
| (4) Documentary & Make Ready Fees | 30.74 | |
| (5) State License Fee | 19.50 | |
| (6) Certificate of Title Fee | $ 2.50 | |
| (7) Drive Out Tag | 1.00 | |
| Total Other Charges | | $ 1,367.41 |
| Unpaid Balance | | $ 8,030.11 |
| Finance Charge | | 2,890.85 |
| Total of Payments | | $10,920.96 |

MB & T filed a proof of claim noting the following calculations:

| | |
|---|---|
| Gross balance due | $ 2,569.04 |
| Less unearned finance charge | 53.00 |
| | $ 2,516.04 |
| Plus late charges accrued prior to the date of filing | 312.14 |
| Net balance due | $ 2,828.18 |
| Plus attorney's fee | 25.00 |
| Total amount of claim | $ 2,853.18 |

The wage earner plan of the debtors was confirmed by the Court on October 28, 1982, and set the secured value of the Chevrolet pickup truck at $4,100.00. Because it did not receive an interest factor in the wage earner plan, MB & T filed a Motion for Adequate Protection on January 24, 1983, seeking interest in the amount of 18% per annum on its net claim. The debtors on March 8, 1983, filed an objection to the late charges and the refund of the unearned post-petition finance charges calculated by MB & T in its proof of claim. The Chapter 13 Trustee, George W. Stevenson, on May 18, 1983, also filed an objection to MB & T's method of calculating unearned post-petition finance charges.

All matters have been settled by the parties except the issue of the proper method of calculating the unearned finance charges.

The Installment Sale Contract and Security Agreement in this case sets out the following provision concerning the refund of unearned finance charges:

You have the right to pay in advance the unpaid balance of this contract and obtain a partial refund of the Finance Charge equal to 6% per annum, computed on each payment for the time each payment is paid in advance of the due date.

The debtors paid approximately 38 monthly installments before filing the Chapter 13 Petition. Pursuant to the above-stated contract provision, MB & T calculated in its proof of claim that the debtors were entitled to a refund of unearned finance charges in the amount of

$53.00. The debtors and trustee contend that the refund in the proof of claim should not have been figured pursuant to the contractual provision, and instead, should have been calculated by the pro-rata method which was set out in the following manner in their briefs:

(a) The total balance owed on the security agreement was $10,420.96, including $2,890.85 finance charge, payable in 48 equal installments of $227.52 each.

(b) The finance charge is $\frac{\$2,890.85}{48} = 60.23$ per month

(c) According to the Bank, the debtors have paid approximately 38 payments. $\frac{8662.53}{227.52} = 38.07$ months paid.

(d) The interest paid prior to the filing of the petition is 38.07 x $60.23 per month interest = $2292.96.

(e) The unpaid interest is 2890.85 total interest
−2292.96 paid interest
597.89 unpaid interest.

(f) Therefore, the claim as filed by the Bank should be amended as follows:

| | |
|---|---|
| Gross balance due | $ 2569.04 |
| Less unearned finance charge | (597.89) |
| | $ 1971.15 |
| Plus pre-petition late charges (if calculated correctly—proof is demanded) | $ 312.14 |
| Net balance due | $ 2283.29 |
| Plus attorneys fees | 25.00 |
| Total claim | $ 2308.29 |

The United States Court of Appeals for the Sixth Circuit provided a seven-step procedure in *Memphis Bank & Trust Company v. Linda Gail Whitman,* 692 F.2d 427, 9 B.C.D. 1140 (6th Cir.1982). Step 3 of the procedure [1] reads as follows:

Determine the amount allowable under applicable law to the creditor by virtue of the debtor's default including unpaid principal, finance charges, interest earned prior to filing but unpaid, etc.

Section 502(b)(2) of the Bankruptcy Code provides:

Except as provided in subsections (f), (g), (h) and (i) of this section, 'if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that such claim is for unmatured interest . . .

The House and the Senate Judiciary Committees made the following comments on § 502(b)(2):

Paragraph (2) requires disallowance to the extent that the claim is for unmatured interest as of the date of the petition. Whether interest is matured or unmatured on the date of bankruptcy is to be determined without reference to any ipso facto or bankruptcy clause in the agreement creating the claim. Interest disallowed under this paragraph includes post petition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of bankruptcy. For example, a claim on a $1,000 note issued the day before bankruptcy would only be allowed to the extent of the cash actually advanced. If the original discount was 10% so that the cash advanced was only $900, then notwithstanding the face amount of note, only $900 would be allowed. If $900 was advanced under the note some time before bankruptcy, the interest component of the note would have to be pro-rated and disallowed to the extent it was for interest after the commencement of the case.

Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor. One unarticulated reason for this is that the discounting factor for claims after the commencement of the case is equivalent to contractual interest rate on the claim. Thus, this paragraph does not cause disallowance of claims that have not been discounted to a present value because of the irrebutable presumption that the discounting rate and the contrac-

---

1. An Order of Clarification was entered by the 6th Circuit on December 17, 1982, amending the original Order by moving Step 3 to Step 2 in the procedure. The new Order, however, did not change the language of the original Step 3.

808

tual interest rate (even a zero interest rate) are equivalent.

H.R.Rep. 595, 95th Cong., 1st Sess. 352–353 (1977), S.Rep. No. 989, 95th Cong., 2d Sess. 62–63 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787, 5848.

Although § 502(b)(2) and its legislative history show a strong Congressional intent to disallow unmatured interest, the question of whether time-price differential comes within the confines of § 502(b)(2) or any other sections of Bankruptcy Code is not directly addressed in the Code. However, a panoptic view of the concept of time-price differential, case law, and the Bankruptcy Code by the Court is more than sufficient for the Court to make an intellegent and conscientious decision.

The concept of "time-price differential" is part of a "limited plan" designed to do no more than authorize a higher rate of interest for consumer loans than would otherwise be permitted under general usury statutes. B. Curran, Trends in Consumer Credit Legislation (1965).

The time-price doctrine first arrived in common law because of a refusal of the courts to subject time sales of land to usury laws. Courts approved the time-price doctrine because most purchasers were substantial landowners who did not need protection from usury. *See generally* 1975 Wis.L.Rev. 246. The earliest case on point involved a land sale which was claimed by the purchaser to be for a usurious rate of interest. The court in that case held that the "agreement was founded partly upon what was considered its price if paid for at a future day." *Beete v. Bidgood,* 108 Eng. Rep. 792, 794 (K.B.1827). This rule was adopted by American courts in *Hogg v. Ruffner,* 66 U.S. (1 Black) 115, 17 L.Ed. 38 (1861).

American courts extended the time-price doctrine and applied it to consumer credit contracts and to purchasers who needed protection from usury, thus, causing the pre-usury regulation problems to reappear. *See* B. Curran, *supra,* at 83. One early critic attacked the time-price doctrine in the following manner:

Interest is compensation for the use of money lent. Whatever thing of benefit comes to the lender as compensation for the use of money is interest, no matter what time it may be given or what expedients may be adopted to conceal the fact that the benefit received is, in essence, compensation for the use of the money. No matter how remote a collateral transaction may seem to be, no matter how shrewdly it is made to appear that a payment to the lender is for something else, if the facts, taken together and read in the light of human experience, justify a natural inference that the lender received the benefit because the borrower had the use of his money and as compensation for the use, the benefit is interest.

The expansion of the automobile industry in the United States in the 1920's and the increased popularity of the installment contract resulted in ten states by 1950 passing retail installment sales acts regulating the amount of time-price differential. 1978 Wash.Univ.L.Q. 147, 143; B. Curran, *supra,* at 2. Nonetheless, most consumer credit legislation assumes that consumers can make intelligent decisions based on available credit information and therefore simply requires full disclosure. *See* Truth in Lending Act, 15 U.S.C. §§ 1601–66. (Regulation Z of the Truth in Lending Act requires only that the method of computing a rebate be disclosed. 12 C.F.R. 226.8(b)(7) ).

Several statutes in Tennessee address the refund of unearned finance charges when an installment contract or loan is prepaid. *See* Tenn.Code Ann. §§ 45–2–1106 (bank installment loans), 45–5–402 (Industrial Loan & Thrift Act), 45–3–705 (state-chartered savings and loan associations), and 47–11–103 (Retail Installment Sales Act.). Sellers under automobile installment sales contracts and assignees of such contracts (such as MB & T), however, have successfully avoided application of the above-cited Tennessee statutes and have protected themselves from state regulation through the time-price exemption.

Tenn.Code Ann. § 47–14–102(1) (1982) provides the following means of escaping state regulation:

(1) "Interest" is compensation for the use or detention of, or forbearance to collect, money over a period of time; and does not include compensation for other purposes, including, but not limited to, time-price differentials, loan charges, brokerage commissions, or commitment fees.

Furthermore, Tenn.Code Ann. § 47–14–120 (1982) provides:

The charging of a time-price differential shall not be deemed to bring a transaction within any regulation of interest, loans or loan charges, commitment fees or brokerage commissions, regardless of whether the seller disposes of the contract containing the time-price differential pursuant to a prearranged agreement, on a recourse or nonrecourse basis, or otherwise.

In addition, Tenn.Code Ann. § 47–14–108 (1982) provides:

Except as limited by statutory provisions expressly applicable thereto, the privilege of prepayment of a loan, in whole or in part, and any refunds or premiums with respect thereto, shall be governed by contract between the parties.

In *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), Justice Hugo Black stated that the amount of claims of creditors and subsisting obligations against the debtor at the time the petition in bankruptcy is filed is a question which, in the absence of federal law, is to be determined by reference to state law. The Supreme Court in *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), held that Congress has left the determination of property rights to state law, unless some federal interest requires a different result.

The United States Court of Appeals for the Sixth Circuit in *In re Madeline Marie Nursing Homes,* 694 F.2d 433, 439 (6th Cir. 1982) stated that state law should be applied in contract cases as well as to issues involving property rights in the absence of bankruptcy law.

It was noted in *In re Virginia Foundry & Company, Inc.,* 9 B.R. 493, 495 (D.W.Va. 1981) that where interest, fees, costs or charges were not allowed under state law, such items could, nevertheless, be allowed as a matter of federal law.

The Bankruptcy Court in *In the Matter of United Merchants and Manufacturers, Inc.,* et al., 5 B.C.D. 1016, 1017 (B.Ct.S.D.N.Y.1979), in agreeing with the principles set out above, stated that "the Court looks to state law for the principles to guide its determination as to the meaning of the contractual provision . . ., and then determines the applicability of those principles in light of the strong policies of the Bankruptcy Act." The Court in *United Merchants, supra,* at 1019, disallowed the claims of two creditors for pre-payment charges because it found that such charges were penalties and the purpose behind such charges was that the claimants wished to increment their contractual rate of interest to compensate for the postponement of some of the principal debt.

Some bankruptcy courts have promulgated methods of refunding unearned finance charges. Bankruptcy courts in *In the Matter of Collins,* 24 B.R. 77 (Bkrtcy.S.D.Mich. 1982) and *In the Matter of Gossage,* 1 B.C.D. 1539 (B.C.W.D.Mo.1975), and this Court in *dicta* in *In re Pettis,* Bk. No. 80–20518 (B.Ct.W.D.Tenn., July 14, 1980), found the pro-rata method should be the method used to calculate unearned finance charges. In striking down the Rule of 78's the Court in *In the Matter of Gossage, supra,* at 1541, stated:

Claimant also has taken the position that the "Rule of 78" is the way in which it is equitable and fair to figure how much interest should be refunded on this loan as constituting unearned interest. The Court is fully aware of how the "Rule of 78" works, and it is admitted by all who understand how it works to be a rule much admired by banks, finance companies and other lending institutions. In the present case the debtors were obligated to pay eight per cent on whatever

balance was due on their loan. They were obligated to pay eight percent up to and including the time the loan was paid in full. The court finds as a conclusion of law that the "Rule of 78" does not apply in the bankruptcy court in figuring unearned interest, but that a "pro rata" is the only fair and equitable method to compute same for the benefit of all creditors.

Bankruptcy Judge Richard L. Merrick, in *In the Matter of Willis,* 6 B.R. 555 (Bkrtcy. N.D.Ill.1980) held:

Notwithstanding the acquiescence of various state and regulatory authorities in the Rule of 78's, this Court finds that it is slanted unduly in favor of the creditor and will not permit its use on precomputed interest add-on loans, which require the Court's approval, that is, on either reaffirmation under Chapter 7 or the establishment of secured priority claims under Chapter 13. The finance companies may continue to use their existing programs if they are able to interpolate in such a manner that they can calculate an appropriate base interest rate by starting with the annual percentage rate which is their maximum. Their programs can continue to be based upon the Rule of 78's, but the agreements must state that interest will be calculated on a straight line basis in the event of prepayment or default. In either of those events a simple transfer of interest paid to principal paid can be made in the account of the debtor. Whether or not the finance company wishes to reduce its earnings for tax or other purposes is not the concern of this Court. The important factor is that the agreement provide that a proportionate amount of interest will be allocated to each month of the scheduled payment period in the event of prepayment or default.

The Bankruptcy Court in *In re Eastern Equipment Company,* 11 B.R. 732 (Bkrtcy.S. D.Va.1981), after looking to the state statute's application of the Rule of 78's, concluded that the Rule of 78's was the proper method of rebate.

The "Rule of 78's" (or "sum of the balances") method is generally used by creditors in installment credit transactions to calculate the unearned interest so that their net claims can be determined. The Rule of 78's is based on the premise that the amount of finance charge rebated upon prepayment should reflect the fact that, in an installment loan transaction, the consumer has use of a larger portion of the principal during the early part of the loan. It is based on the idea of a 12-month loan repayable in equal installments where if the borrower takes out a $1,200 loan, he has use of 12 $100 bills the first month, 11 $100 bills the second month, 10 the third month, and only one the last month. He, therefore, has use of 78 $100 bills (12 plus 11 plus 10 ... plus 1). The number 78 becomes the denominator of the fraction while the numerator depends upon when the prepayment takes place. If the prepayment is made at the seventh installment, $57/78$ of the total finance charge has been earned by the creditor (the numerator is the sum of 12, 11, 10, 9, 8 and 7). J. Fonseca and P. Teachout, Handling Consumer Credit Cases (2nd ed. 1980).

The pro-rata method of calculating unearned finance charges, as proposed by the trustee and debtors in this case, provides a substantial benefit to the debtors while not taking into consideration that the debtor has the use of more of the creditor's money or property during the first installment payments than during the last installment payments (as referred to above in the discussion of the Rule of 78's). On the other hand, the 6% finance-charge refund (as set out in MB & T's installment sale contract and security agreement) is nothing more than a prepayment penalty in direct contravention of the strong, underlying policies of the Bankruptcy Code. *See In the Matter of United Merchants and Manufacturers, Inc., supra.*

As addressed heretofore, a basis for the time-price doctrine on a credit sale is that a seller could charge one price for cash sales and a higher price for a sale to be paid over a period of time because the higher price

would take in consideration that it would not be fully paid until some future date possibly several years from the date of sale. MB & T's contractual provision on the 6% refund of the unearned finance charges, however, does not take in consideration the above-mentioned basis for the time-price doctrine, but instead merely penalizes a consumer for the pre-payment or refinancing.

The 6% refund of unearned finance charges is also incongruous with the Sixth Circuit Court of Appeal's decision of *Memphis Bank & Trust Company v. Linda Gail Whitman, supra,* (a case involving the same creditor and contract form as in the present case), which noted, "on a secured consumer debt, the Code does not authorize the Court to assess such interest on the value of the collateral and also charge the debtor in the unsecured claim with the contract rate of interest on the principal, thereby doubling up on the interest."

The refund penalty of MB & T would result in a distribution in the wage earner plan that would be detrimental to other secured creditors and unsecured creditors. Equality of distribution reflects one of the basic aspects of the philosophy of bankruptcy law. *In the Matter of Iowa Premium Service Co., Inc.,* 12 B.R. 597 (Bkrtcy.S.D. Iowa 1981); *Sampsell v. Imperial Paper and Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941).

Furthermore, 3 Collier on Bankruptcy § 502.02 (15th ed. 1982) notes:

It should be borne in mind that bankruptcy courts retain the inherent power to determine how the assets of a debtor should be distributed and that equitable principles apply in the administration of bankruptcy. Thus, upon equitable principles, the bankruptcy court supersedes the state law view of the validity of a claim and the payment of interest accrued subsequent to the filing of the petition. For this reason, a claim for interest on interest accruing during the pendency of a case subsequent to the filing of the petition has been disallowed although the assets were sufficient to pay the claim and the claim was assumed to be valid to the extent of such interest under applicable state law.

In accordance with the principles set out heretofore, the Court finds that the provision for a 6% refund of unearned finance charges in the installment sale contract and security agreement assigned to MB & T is nothing more than a penalty which impedes the firm objectives of bankruptcy law, and therefore the claim of MB & T, as presently calculated, is denied. The Court will, however, allow MB & T to amend its proof of claim to reflect a refund of unearned finance charges based on the Rule of 78's.

IT IS, THEREFORE, ORDERED:

1. That the claim of Memphis Bank and Trust Company, Inc., is hereby disallowed as presently calculated; and

2. That Memphis Bank & Trust Company, Inc. should be allowed to amend its proof of claim to reflect a refund of unearned finance charges calculated by the method of the Rule of 78's.