In the Matter of Donald P.
MacDONALD, III, Debtor.

Donald P. MacDONALD, III, Plaintiff,

v.

FIRST INTERSTATE CREDIT
ALLIANCE, INC., Defendant.

Bankruptcy No. 88–108.
Adv. No. 88–62.

United States Bankruptcy Court,
D. Delaware.

May 17, 1989.

Patrick Scanlon, Dover, Del., for debtor/plaintiff.

Edward F. von Wettberg, III, Wilmington, Del., for defendant.

### MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

MacDonald, a Chapter 11 debtor, has objected to First Interstate's proofs of claim and seeks to enjoin First Interstate from repossessing collateral.

In June of 1988, First Interstate, by operation of law, obtained relief from the automatic stay to proceed against five pieces of equipment MacDonald used in his logging business. MacDonald surrendered three of those pieces but refused to turn over a knuckleboom loader and a 35′ tandem axle trailer. First Interstate auctioned the surrendered equipment and initiated a replevin action in the state court. It is this action MacDonald seeks to enjoin.

MacDonald objects to First Interstate's proofs of claim on several grounds. MacDonald contends that First Interstate disposed of repossessed equipment in a commercially unreasonable manner and is not entitled to a deficiency; that the financing documents contain unconscionable provisions and that First Interstate's computation of its claim improperly includes unearned "interest" charges, attorneys' fees and costs.

*Background*

Between 1984 and 1986, First Interstate financed MacDonald's purchase of logging equipment from Alban Tractor Co. and Morbark North Carolina, Inc. as follows:

| Date of Purchase (First Interstate Account No.) | Identification of Purchase Contract | Description of Equipment |
| --- | --- | --- |
| *1. 9/20/84 | Security Agreement (Conditional Sale Contract) with Alban Tractor Co. | Allis Chalmers "articulated" wheel loader |
| *2. 11/8/84 | Security Agreement (Conditional Sale Contract) with Alban Tractor Co. | Caterpillar grapple skidder |
| +3. 2/8/85 (C–02–02065) | Security Agreement (Conditional Sale Contract) with Alban Tractor Co. | log loader and trailer |
| *4. 8/30/85 | Security Agreement (Conditional Sale Contract) with Alban Tractor Co. | Allis Chalmers wheel loader |

* MacDonald has either paid the time balance covered by these contracts or traded in the equipment for other equipment. In any event, First Interstate considers these contracts as having been paid.

+ This equipment is the subject of First Interstate's replevin action.

| Date of Purchase (First Interstate Account No.) | Identification of Purchase Contract | Description of Equipment |
|---|---|---|
| °5. 10/14/85 (C–02–02929) | Security Agreement (Conditional Sale Contract) with Alban Tractor Co. | Caterpillar grapple skidder and grapple p-gram |
| °6. 6/15/86 (C–02–02856) | Conditional Sale Contract Note with Morbark North Carolina, Inc. | Morbark logger |

The five Alban Tractor Co. security agreements are identical form contracts under which title and a security interest is reserved in the seller and the buyer agrees to pay a time balance in installments, insure the equipment and waive any defense as against an assignee. A cross-collateralization clause appears in each agreement. The financing arrangements for each purchase had been previously negotiated and all documents completing the transaction were signed on the purchase date. The conditional sale contract note and Delivery Installation Certificate MacDonald signed with Morbark North Carolina, Inc. contains identical provisions. Each of these six contracts were assigned by separate instruments for value and without notice of any claims, defenses or offsets.

In addition, the Morbark contract and subsequent extension agreement between First Interstate and MacDonald modifying the payment schedule on the Caterpillar grapple skidder and grapple-p-gram grant security interests in *all* of MacDonald's equipment and other property to secure *all* of his obligations to First Interstate. (emphasis added)

*First Interstate's Claim*

As of December 6, First Interstate claims that the total amount due from MacDonald on the three open contracts is $75,612.63 (plus attorneys' fees and court costs) computed as follows:

|  | C–02–02065 (log loader & trailer) | C–02–02856 (Morbark logger) | C–02–02929 (Caterpillar grapple skidder & p-gram) |
|---|---|---|---|
| date of default | 11/10/87 | 11/3/87 | 10/16/87 |
| date of last payment | 11/27/87 (for 10/87 payment) | 11/10/87 (for 10/87 payment) | 12/17/87 (for 9/87 payment) |
| balance due at time of default | 9,595.00 | 29,442.00 | 76,139.70 |
| less payments | −1,919.00 (11/27/87) | −1,402.00 (11/10/87) | −2,928.45 (10/22/87) −2,928.45 (12/17/87) |
| default balance | 7,676.00 | $28,040.00 | 70,282.80 |
| late charges on payments | + 913.40 | + 232.33 | +1,130.05 |
| late charges on account balance | + 383.30 (one time charge) | +5,891.34 (10/16/87 to 8/25/88) | +3,514.14 (one time charge) |
|  | 8,973.20 | 34,163.67 | 74,926.99 |
| less net auction proceeds on 8/25/88 |  | −$14,404.38 | −29,404.39 |
|  |  | 19,759.29 | 45,522.60 |
| additional late charges |  | +1,357.29 (13.18/day from 8/26/88 to 12/6/88) |  |
|  |  | 21,116.83 |  |

° This equipment was surrendered to and sold by First Interstate.

*MacDonald's Objections*

### (1) *Disposition of Repossessed Collateral*

■ The Delaware Uniform Commercial Code requires every aspect of a sale or other disposition of repossessed collateral by a secured party after default to be "commercially reasonable", including the method, manner, time, place and terms. Reasonable notification of the time and place of any public sale must be sent to the debtor, and the secured party may buy at public sale. 6 *Del.C.* § 9–504(3). MacDonald objects to (a) the price obtained, (b) the location and method of sale and (c) the notice given to him and potential purchasers.

First Interstate removed the "cat skidder and p-gram" and Morbark logger to the yard of Elliot and Frantz, Inc., a dealer in such equipment located in Delmar, Delaware. Notice of a public auction sale to be held August 25, 1988 at 9:00 a.m. was published in *The Daily Times*, Salisbury Maryland, and the *Delaware State News*, Dover, Delaware, on August 14 and 21; and the *Construction Equipment Guide* on August 17, 1988. Written notice of the date, time and place of auction was given to MacDonald on August 4 and 10 and to Alban Tractor Co. and Morbark North Carolina, Inc. on August 12. The equipment was also listed on First Interstate's regional and national lists of repossessed equipment which lists are available not only to First Interstate's employees but also to persons who might be interested in purchasing used equipment.

The sale conducted by Atlantic Auctions, Inc. took place as scheduled on August 25. MacDonald was not present and First Interstate was the only bidder on both pieces of equipment. It bid in the cat skidder/p-gram for $30,000 and the Morbark logger for $15,000. As of the trial date the equip-ment had not been resold and First Interstate was offering it for sale at $54,000 and $24,500, respectively. Its undisputed opinion as to the quick sale value of the cat skidder is $37,000 and the logger $19,000.

#### (a) *Price*

First Interstate bid in the equipment for an amount less than its quick sale value. This alone does not mean the sale was commercially unreasonable.

Section 9–507(2) of the Delaware Uniform Commercial Code provides in part as follows:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.

6 *Del.C.* § 9–507(2).

Delaware cases establish the rule that absent unusual circumstances, foreclosure sales will be set aside only if the sale price is so grossly inadequate as to shock the conscience of the court. In general, the standard has been met where the sale price represented 50% of fair market value. 2 *Wooley on Delaware Practice* § 1121; *Home Beneficial Life Ins. Co. v. Blue Rock, et al.*, 379 A.2d 1147, 1149 (Del.Super.1977); *Central National Bank v. Industrial Trust Co.*, 43 Del. 530, 51 A.2d 854 (1947); *In re Downham Co.*, 35 Del. 294, 165 A. 152 (1932).

The law does not require that the purchase price be at least equivalent to an estimated quick sale value. MacDonald contends, however, that failure to reach those figures plus the fact that First Interstate was the only bidder constitutes bad faith or unusual circumstances. In support of the bad faith allegation, he asks the court to find that First Interstate has a practice of selling and bidding in repossessed collateral at sparsely attended pub-

lic sales at prices greatly below fair market value and selling it at a later date at a substantially greater price. This argument must be rejected. The issue is the commercial reasonableness of this particular sale. Only the facts and circumstances of this sale are relevant.

Here, First Interstate paid 56% of the fair market value of the cat skidder and 62.5% of the fair market value of the logger. Moreover, while First Interstate had attempted to sell the equipment at or near its fair market value over more than a three-month period, it had not found a buyer for either piece. Thus, the price component of the sale is commercially reasonable.

(b) *Location and Method of Sale*

MacDonald asserts that the location of sale in rural Sussex County, removed from the majority of the population of Delaware and northern Maryland, was commercially unreasonable. At first blush this argument appears meritorious, but it is not.

The equipment was sold at a public auction by a professional auctioneer in the yard of a dealer in logging equipment near Delmar, Delaware. Potential purchasers of this type of specialized equipment live and work in the wooded rural areas around Delmar. They do not live in urban centers.

MacDonald also takes issue with the method of sale—public as opposed to private. He asserts that Elliot and Frantz, dealers in this type of equipment and upon whose premises the sale was conducted, do not sell equipment this way. Indeed, Elliot and Frantz normally sell equipment at private sale and only hold an auction under extraordinary circumstances. If First Interstate were a dealer in goods of that kind as defined in the Delaware Uniform Commercial Code, then MacDonald's analysis as to the industry custom reflected by the practices of Elliot & Frantz who are such merchants would be relevant. 6 *Del.C.* § 2–104(1). However, First Interstate is not such a merchant. Its business is the extension of credit. The two cannot be compared. An equipment dealer is selling inventory. As such, he has his own yard in which equipment may be stored and a service department to maintain the equipment before sale and after during the warranty period. Neither of these are available to a repossessing finance company like First Interstate.

Moreover, in selling inventory, a dealer is not constrained by 6 *Del.C.* § 9–504 as is a repossessing finance company. Such a creditor must dispose of the equipment within a reasonable time. He cannot wait until he finds a buyer willing to pay his price as a dealer might.

Finally, there is no evidence that a private sale would have produced a higher price. MacDonald asserts only the possibility of a better price. There is no evidence of anyone else willing to buy the equipment. Further, First Interstate continues to have difficulty in disposing of the equipment. This indicates at least superficially, that the private market is not promising. Therefore, the location and method of sale were commercially reasonable.

(c) *Notice*

MacDonald contends that notice of sale was inadequate. He does not object to content of the notices but does contend that the notices were improperly placed and did not give the public sufficient time to act.

A debtor must receive reasonable notice of sale so as to give him an opportunity to arrange alternative financing to redeem the collateral or otherwise protect his interests. 6 *Del.C.* 9–504(3); *Wilmington Trust Co. v. Conner*, Del.Supr., 415 A.2d 773 (1980); *Rushton v. Shea*, 423 F.Supp. 468 (D.Del.1976). The usual method of giving public notice is to place an advertisement in a newspaper of general circulation enough times for the general public to become aware of the sale. *See* 9 *Anderson on Uniform Commercial Code* 9–504.48 at 751 Third Edition (1985).

MacDonald received notice twice by letters enclosing copies of the sale notice 21 days and 15 days before the scheduled sale date. The original sellers of the equipment also received notice by mail. Notice of sale was published in two newspapers of general circulation in Maryland and Delaware 11 and 6 days before the sale. The notice also

appeared in a trade journal 8 days before the sale. Further, the equipment was included on a repossession list maintained by First Interstate and available to interested parties for inquiries.

The timing and placement of the advertisement in the two newspapers of general circulation satisfies not only the notice to the general public but also to the users and dealers of the kind of equipment advertised for sale since it was coupled with an advertisement in a trade journal. To require actual notice to a particular segment of the public, as MacDonald suggests, would place an unreasonable burden on a creditor.

Section 9–504(3) requires only "reasonable" notice to a debtor. It does not specify, nor should courts read, a specific number of days into the statute. Time must be tailored to the circumstances of a particular situation.[1] The 21 and 15–day notices gave MacDonald ample time to take steps to protect his interests.

Having considered seriatim MacDonald's objection as to the reasonableness of the sale, I conclude that First Interstate's sale of the cat skidder/p-gram and Morbark logger was commercially reasonable. This poses the next two questions as to the nature and amount of the claimed deficiency balance; that is, whether the cross-collateralization and omnibus clauses are unconscionable; and whether First Interstate is improperly claiming unearned interest and attorneys' fees.

### (2) Unconscionability Allegations

Each of the five security agreements MacDonald signed with Alban Tractor Co. calls for him to pay a "time balance" for the equipment in installments and contains the following provisions:

*On the face:*
Seller reserves title to and a security interest in the equipment until all amounts due or to become due are fully paid in cash.

*On the reverse side:*

1. SECURITY INTEREST AND TITLE. Seller hereby retains title to and is granted a security interest in the equipment being sold hereunder and any and all replacements of and accessions thereto and any proceeds therefrom until all amounts due hereunder have been fully paid in cash.... The equipment shall secure the prompt and full payment by buyer of all of Buyer's obligations to Seller and its assignee.

\*　\*　\*　\*　\*　\*

12. CONSTRUCTION OF AGREEMENT.... This writing contains the full, final and exclusive statement of the contract of the parties.... It is agreed that Buyer may not assert against an assignee of Seller, any defenses which Buyer may have against Seller, and the total purchase price hereunder shall be paid to such assignee, without diminution, irrespective of the existence of any such defenses.

The Morbark conditional sale contract note signed by MacDonald requires him to pay a "contract price (time balance)" and contains the following provisions:

*On the face:*
Title to the property is to remain in Holder until the time balance and any and all other sums owing by Buyer to Holder or any judgment therefor are fully paid and all the terms, conditions and agreements herein contained shall have been fulfilled.... Buyer acknowledges that no warranties, representations nor agreements not expressed herein have been made by Holder. Buyer further acknowledges notice of Seller's intended assignment/endorsement of this contract note, and upon such assignment/endorsement, Buyer agrees not to assert against any assignee/endorsee hereof any defense, setoff, recoupment claim or counterclaim which Buyer may have against Seller, whether arising hereunder or otherwise. In any jurisdiction where the Uniform Commercial Code is in effect Buyer grants to Holder a security interest in the property and any and all inven-

---

1. *See 9 Anderson on Uniform Commercial Code* § 9–504.53 at 754–55 Third Edition (1985).

Three full business days between notification and sale are adequate.

tory, goods, equipment, machinery, fixtures and assets of any and every kind, wherever located now or hereafter belonging to Buyer or in which Buyer has any interest (all hereinafter collectively called "collateral") and agrees that said security interest secured any and all obligations of Buyer at any time owing to Holder, now existing and/or hereafter incurred.

*On the reverse side:*

Holder is hereby authorized to file one or more financing statements or a reproduction hereof as a financing statement.

\* \* \* \* \* \*

This contract note contains the entire agreement of the parties and may not be modified except in writing.

Each of the financing statements attached to First Interstate's proofs of claim relative to the Alban purchases contain omnibus language as follows:

All Goods, Chattels, Machinery, Equipment, Inventory, Accounts Chattel Paper, Notes, Contract Rights, Receivables, Accounts Receivable, General Intangibles, Furniture, Fixtures and Property of every kind and nature, wherever located now or hereafter belonging to Debtor or in which Debtor has described in attached entire Agreement and/or in any Schedule prepared in connection therewith. This Form and/or the attached Security Agreement and/or Schedule are being submitted for filing as a Financing Statement.

The agreement signed by MacDonald extending the payment schedule on the cat skidder/p-gram contains the following language:

In order to induce you to agree to the foregoing extension, and, in consideration of your so doing, the undersigned warrants that the above indebtedness is a valid, binding and existing obligation of the undersigned, due and payable without any defense, counterclaim or offset whatsoever, and promises and agrees to pay said indebtedness to your order according to the terms set forth above, at your offices or such other place of payment you may designate, and in the event of a default in the payment of any installment or interest when due, the entire unpaid balance shall, at your option immediately become due and payable and you may enforce your rights and remedies under the Lien Instrument and/or Notes as if this extension had not been granted, and the undersigned grants you a security interest in all equipment, inventory, goods, machinery, fixtures, assets and property of any kind and nature now owned or hereafter acquired, to secure the payment, performance and fulfillment of all obligations of the undersigned to you whether now existing or hereafter incurred.

The undersigned further acknowledges and warrants that legal title to or a first lien upon the property described in the Lien Instrument is and shall continue to be vested in you, your successors and assigns, until the undersigned has paid in full, and has performed all of its obligations to you, with interest, whether under the Lien Instrument and/or Notes or otherwise....

The security agreement for one other purchase financed through Union Trust Company of Maryland and subsequently assigned to First Interstate contains cross-collateralization language as follows:

B. *"Obligations"* means all indebtedness and other liabilities, direct or indirect, fixed or contingent, joint, several or independent, now or thereafter owed by Debtor to Secured Party, whether due or unmatured, or held or to be held by the Secured Party for its own account or for another or others, whether created directly or acquired by assignment or otherwise and howsoever evidenced. Debtor understands and agrees that the broad and all-inclusive definition of the word "Obligations" shall be liberally construed so that Secured Party may thereby open new and additional credit facilities for Debtor, whether or not the same may presently be contemplated.

\* \* \* \* \* \*

II *GRANT OF SECURITY INTEREST.* As security for the due and punctual payment of any and all of the

present and future Obligations (as defined in Section (B)) of Debtor, Debtor hereby grants to Secured Party a continuing security interest in (a) all the Collateral (as defined in Section (A)) whether now or hereafter existing or acquired and (b) all present and future products and proceeds of the Collateral.

MacDonald claims that the cross-collateralization clauses are hidden in the "boilerplate"; that he was told by a representative of Alban Tractor that only the equipment being purchased under the specific contract was subject to a security interest, and that First Interstate on the Alban purchases avoided disclosing this fact by attaching copies of executed contracts to unsigned financing statements on which First Interstate used the broader "omnibus" language.

■ Cross-collateralization provisions are an accepted method of securing financing on multiple equipment purchases. Such an arrangement is normally used where a debtor enters into multiple but separate contracts with a single financing institution. While cross-collateralization provisions are not unreasonable in themselves, the manner of their appearance may make them unconscionable. That isn't the case here. MacDonald was obviously aware of such provisions for he asked an Alban Tractor representative whether its agreement secured anything other than the equipment being purchased. The fact the representative may have told him otherwise is of no consequence under the circumstances here.[2] While it's true that the provision appears in a form contract, is not clearly stated in several of them and is difficult to find in the small print boilerplate, inclusion of such provisions are common in the industry. Further, MacDonald signed six agreements all of which contain cross-collateralization provisions. Repeated use of a challenged clause in a commercial setting weighs against a finding of unconscionability. *Lindemann v. Eli Lilly and Company*, 816 F.2d 199, 204

(5th Cir.1987). Thus, despite First Interstate's superior bargaining power, the provisions are not unconscionable.

■ Not so as to the omnibus clauses. The omnibus language grants security interests in everything MacDonald owns so long as he owes any money to First Interstate whether the property was financed by First Interstate or not.

The purpose of Uniform Commercial Code § 2–302 is to prevent oppression and unfair surprise in consumer and non-consumer areas. In determining unconscionability, it is appropriate to note how nearly equal is the bargaining power, experience, and knowledge of the parties in a commercial setting as well as in a consumer transaction.

First Interstate cannot successfully argue any benefit from the waiver of defense clauses in the Alban Tractor contracts. The omnibus language appears only on the financing statements which MacDonald did not sign. Neither can it derive any benefit from the Morbark contract nor the extension agreement. The omnibus language as well as the waiver clause is hidden in boilerplate in paragraphs without headings which are long and difficult to read. Moreover, both of these agreements are First Interstate's form contract offered on a take it or leave it basis to an unsophisticated logger who did not finish the 11th grade. The record does not reflect that MacDonald fully understood those provisions, especially in connection with an extension of a payment period. It has not been shown that First Interstate in dealing directly with MacDonald explained their meaning and that there was in fact a real and voluntary meeting of minds and not merely an objective meeting. *Weaver v. American Oil Co.*, 257 Ind. 458, 464, 276 N.E.2d 144 (1971).

Unlike cross-collateralization provisions, the omnibus clause by nature is unconscionable. It is not analogous to an after-acquired property clause as First Interstate argues. It is an example of overreaching

---

**2.** Hearsay evidence; moreover, such a defense is specifically waived under the contracts and 6

*Del.C.* § 9–206(1).

and when combined with a waiver of defense clause is extremely offensive. *See Tulowitzki v. Atlantic Richfield Company*, 396 A.2d 956, 960 (Del.Supr.1978).

Having found the omnibus clause unconscionable, the remaining question is the extent of the cross-collateralization provision insofar as it relates to all of First Interstate's contracts with MacDonald. Three of the six contracts are fully paid. It would be unconscionable to read a cross-collateralization provision as allowing a creditor to go back in time to enforce the provision against equipment which is now wholly paid off. To do so, would give a creditor a power almost equal to the unconscionable omnibus clause. In addition, such results are prohibited by Delaware law.

> .... The contract may also provide that the goods purchased under the previous contract or contracts shall be security for the goods purchased under the subsequent contract *but only until such time* as the time sale price under the previous contract or contracts is fully paid. (emphasis added) 6 *Del.C.* § 4327

Consequently, the equipment once fully paid off ceases to be collateral for any other existing obligations. Only equipment which is the subject of those existing obligations may be levied against pursuant to a cross-collateralization provision.

### (3) *Computation of Claim*

MacDonald's final argument is that First Interstate's calculations of its claim is in error. More specifically, First Interstate is not entitled to (a) post-petition interest, (b) late charges and attorneys' fees. This argument is meritorious.

### (a) *Interest*

■ Section 502(b)(2) of the Bankruptcy Code provides that the court in determining the amount of a disputed claim shall not allow any unmatured interest. First Interstate contends that its claim is not for interest but a time-price differential and points to a number of cases which have held that time-price differential is not subject to state usury laws. It asks the court to find inferentially that time-price differ-

ential is not interest. Some jurisdictions have so found. *See Leasing Service Corporation v. David Graham*, 646 F.Supp. 1410, 1417 (S.D.N.Y.1986) [Interpreting Texas law].

The better view is succinctly stated by the court in *In re Clausel*, 32 B.R. 805 (Bkrtcy.W.D.Tenn.1983).

> Although § 502(b)(2) and its legislative history show a strong Congressional intent to disallow unmatured interest, the question of whether time-price differential comes within the confines of § 502(b)(2) or any other sections of Bankruptcy Code is not directly addressed in the Code. However, a panoptic view of the concept of time-price differential, case law, and the Bankruptcy Code by the Court is more than sufficient for the Court to make an intelligent and conscientious decision.

> The concept of "time-price differential" is part of a "limited plan" designed to do no more than authorize a higher rate of interest for consumer loans than would otherwise be permitted under general usury statutes. B. Curran, Trends in Consumer Credit Legislation (1965).

When viewed against human experience one cannot but conclude that time-price differential like interest is merely compensation to a creditor for the use of its money over time. This rationale is even more persuasive when as here a creditor has repossessed and sold the collateral. After collateral has been sold, it cannot be said the creditor is advancing a sum of money of which a debtor had use. Where a time-price differential is computed over the life of a contract that ends prematurely by default, some part of the time-price differential is unmatured. This situation is analogous to one where a debtor has prepaid the time-price differential and subsequently pays off the principal early. By statute, creditor must rebate the time-price not earned. 6 *Del.C.* § 4322(b) (See Appendix). The provisions of § 4322(b) should be used here where the creditor is undersecured to roll back the time-price differential to the time the petition was filed. The time-price differential for the period from

the default to the filing of the petition is not refundable as it was prepaid and earned before the bankruptcy.

### (b) *Attorneys' Fees, Costs and Late Charges*

■ The matter of attorneys' fees is controlled by two separate statutes, 6 *Del.C.* § 4344 which determines how, if at all, attorneys' fees will be paid and 11 U.S.C. § 506(b) which determines what if anything will be paid in the context of a bankruptcy. This same section controls the awarding of costs. Section 4344 is merely an enabling statute which provides that fees and costs will be paid pursuant to the contract. Conversely, § 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim and any reasonable fees, costs or charges provided for under the agreement under which such claim arose.

Succinctly, a creditor may recover late charges, attorneys' fees and costs only to the extent that it is oversecured. First Interstate is undersecured and not entitled to such a recovery.

First Interstate's secured claim is based on the cross-collateralization and omnibus clauses. First Interstate may calculate its security only to the extent they are effective. Since the omnibus clause is void, its security cushion is further reduced. Three of the six contracts under which First Interstate financed equipment for MacDonald have been fully paid off. Consequently, it may look only to the collateral on the open accounts (cat skidder, Morbark logger, knuckleboom loader and the trailer). Since the cat skidder and logger were repossessed and sold, the cross-collateralization clause is limited to the knuckleboom loader and trailer.

As of December 6, it claimed a total amount due of $75,612.63. Of this amount, $66,639.43 represents a deficiency, which includes the impermissible portion of the amount charged for the difference between the cash price and time-price and late charges. Ascribing to the loader and trailer its maximum value, $29,000, First Interstate is undersecured; more so, at quick sale value.

The matter of late charges is also covered by § 506(b). As with attorneys' fees, late charges may be gotten only when a creditor is oversecured. Having already concluded that First Interstate is undersecured, it is not entitled to late charges. Nevertheless, creditor's method of calculating those late charges must be commented upon. Where late charges may be charged, they are a creature of statute in Delaware and as such may only be charged in accord with 6 *Del.C.* § 4308:

> A contract may provide for the payment by the buyer of a delinquency charge on each installment in default for a period of not less than 10 days in an amount not in excess of 5 percent of such installment or $5, whichever is less, but a minimum charge of $1 may be made. Only one such delinquency charge may be collected on any such installment regardless of the period during which it remains in default....

Here, First Interstate has charged a late fee on the missed installment and again on the unpaid balance. This clearly violates § 4308 and would be struck in part had creditor been entitled to recover late charges.

■ Finally, First Interstate has inexplicably attempted to place a late charge on the unpaid deficiency after the sale of August 25, 1988. MacDonald's obligation to make regular installment payments was extinguished upon repossession of the equipment under two of the contracts. He no longer had any interest in the property; hence, no duty to make the installment payments to which a late charge might attach. All that remained after the sale is an unsecured claim for the deficiency. There can be no late charges on a deficiency.

In summary, the sale conducted by First Interstate was commercially reasonable; the cross-collateralization provisions are valid but the omnibus clause is unconscionable, and First Interstate is not entitled to

late charges, unearned premium charged for the difference between cash and time payment, attorneys' fees and costs. The recomputed claim for a deficiency due following sale of the repossessed equipment, absent an objection as to correctness of computation, shall be treated as an unsecured claim.

### MacDonald's Complaint for Injunctive Relief

■ MacDonald is asking that First Interstate be enjoined under 11 U.S.C. § 105(a) from proceeding with its replevin action to recover the knuckleboom loader and a 35′ tandem axle trailer, collateral under the third contract listed on page 715, *supra*. Subsequent to relief from stay by operation of law, MacDonald turned over to First Interstate the collateral on the other two open accounts (See numbers 5 and 6 on page 715, *supra*) but refused to turn over the loader and trailer. MacDonald contends this equipment is essential to his business and an effective reorganization.

First Interstate argues that § 105(a) may not be used to "reinstate" the automatic stay. There cannot be a "reinstatement" of the automatic stay provisions of 11 U.S.C. § 362(a) inasmuch as there is no such provision within § 362. However, under 11 U.S.C. § 105(a), a court has discretion to consider on a case-by-case basis whether equity demands the issuance of an injunction. This is so regardless of the fact that First Interstate obtained relief by operation of law.

MacDonald cannot obtain an injunction absent a showing of a lack of an adequate remedy at law and that the balance of hardship tilts substantially in his favor. He has satisfied the first requirement. After First Interstate obtained relief from stay, it was entitled to possession of the loader and trailer. Thus, the only way available to MacDonald to halt First Interstate's replevin action was by looking to equitable relief.

In determining hardship, a § 362(d)(1) and (2) analysis is appropriate. The facts of the case are such that if the loader and trailer served as security only for the contract under which it was purchased, its quick sale value of $20,000 exceeds the balance due of $8,973.20. Thus, First Interstate would be adequately protected.

Unfortunately for MacDonald, the loader and trailer by virtue of the cross-collateralization provisions serve as security for the three contracts in default at the time of the bankruptcy filing. Assuming *arguendo* that the loader and trailer are worth fair market value of $29,000, it is clear that the amount of First Interstate's claim, even taking into consideration its required reduction, would exceed the value of its collateral. MacDonald has been using the equipment since last summer. It follows that its value is depreciating. Consequently, despite MacDonald's escrow of funds pending resolution of this dispute, First Interstate is not adequately protected. This set of facts also shows that MacDonald has no equity in the loader and trailer. Thus, he would not be able to defeat an action at law under § 362(d)(1). Nor would he be successful under subsection (d)(2). MacDonald has no equity in the equipment. While he testified the loader and trailer are essential to his reorganization, it is unlikely that there can be an effective reorganization in light of First Interstate's substantial claim, despite possible cram-down on its secured portion, because of First Interstate's likely rejection as a member of the unsecured class in any proposed plan.

Having concluded that the logger and trailer serve as collateral for a debt much larger than that owing on contract # 3 ($8,000); that MacDonald has had use of the equipment for an extended period of time following relief from stay; that the equipment has depreciated in value, and that First Interstate is not adequately protected, places the greater hardship on First Interstate. Consequently, MacDonald's complaint for injunctive relief must be dismissed.

An order in accordance with this Memorandum Opinion is attached.

## APPENDIX

6 *Del.C.* § 4322(b)

(a) A buyer may prepay the debt due under a retail installment contract in full at any time.

(b) If the service charge imposed pursuant to § 4315 of this title in respect of a retail installment sale has been precomputed and taken in advance, then, in the event of prepayment of the entire indebtedness, the holder shall refund to such buyer the unearned portion of the precomputed service charge. This refund shall be in an amount not less than the amount which would be refunded if the unearned precomputed service charge were calculated in accordance with the actuarial method, except that the buyer shall not be entitled to a refund which is less than $1. The unearned portion of the precomputed service charge is, at the option of the holder, either:

(1) That portion of the precomputed service charge which is allocable to all originally scheduled or, if deferred, all deferred payment periods, or portions thereof, ending subsequent to the date of prepayment. The unearned precomputed service charge is the total of that which would have been earned for each such period, or portion thereof, had the debt due under the retail installment contract not been precomputed, by applying to unpaid balances, according to the actuarial method, an annual percentage rate based on the precomputed service charge, assuming that all payments were made as scheduled, or as deferred, if deferred. The holder, at its option, may round this annual percentage rate to the nearest one-quarter of 1 percent; or

(2) The total precomputed service charge less the earned precomputed service charge. The earned precomputed service charge shall be determined by applying an annual percentage rate based on the total precomputed service charge, under the actuarial method, to the unpaid balances for the actual time those balances were unpaid up to the date of prepayment.

(c) As used in subsection (b) of this section:

(1) "Actuarial method" means the method of allocating payments made on a debt due under a retail installment contract between the outstanding balance of the indebtedness and the service charge pursuant to which a payment is applied first to the accumulated service charge and any remainder is subtracted from the outstanding balance of the indebtedness.

(2) "payment period" means the time period within which periodic installment payments of the indebtedness are due under the terms of a retail installment contract.

(d) If a charge was made to a buyer for premiums for insuring such buyer in respect of a retail installment contract, then, in the event of prepayment, the holder shall refund to such buyer the excess of the charge to such buyer therefor over the premiums paid or payable to the holder, if such premiums were paid or payable by the holder periodically, or the refund for such insurance premium received or receivable by the holder if such premium was paid or payable in a lump sum by the holder, provided that no such refund shall be required if it amounts to less than $1.

(e) In connection with any prepayment of a debt due under a retail installment contract, a holder may not impose any prepayment charge.

### ORDER

AND NOW, May 17, 1989, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. Donald P. MacDonald, III's objections to First Interstate Credit Alliance, Inc.'s proofs of claim are SUSTAINED.

2. First Interstate Credit Alliance, Inc. is granted 30 days within which to file amended proofs of claim in accordance with the attached Memorandum Opinion.

APPENDIX—Continued

3. Donald P. MacDonald, III's complaint seeking injunctive relief is DISMISSED.