McDONALD MOBILE HOMES, INC.,
d/b/a Harrison Home Center *v.*
BANKAMERICA HOUSING SERVICES

CA 05-544                                      218 S.W.3d 376

Court of Appeals of Arkansas
Opinion delivered November 30, 2005

*James D. Sprott, P.A.*, by: *James D. Sprott* and *Huckabay, Munson, Rowlett and Moore, P.A.*, by: *Beverly A. Rowlett*, for appellant.

*Matthews, Sanders & Sayes*, by: *Doralee Chandler* and *Mel Sayes*, for appellee.

DAVID M. GLOVER, Judge. McDonald Mobile Homes, Inc., d/b/a Harrison Home Center, appeals from a judgment entered by the Carroll County Circuit Court for appellee BankAmerica Housing Services. We reverse the circuit court's decision and remand for further proceedings consistent with this opinion.

This case had its origin in a contract entered into by appellant and Charles Copeland and his wife, Elinor Copeland (now deceased), on April 28, 1997, whereby appellant sold a purportedly new manufactured home to the Copelands for $80,201.50. Saturn Housing, LLC, manufactured the home. The Copelands gave a cash down payment of $4350 and financed the balance. The installment contract provided that any holder of the contract would be subject to all claims and defenses that the Copelands could assert against appellant. It also set forth the following assignment provision regarding appellee, which was described as the "Creditor":

> With respect to this retail installment contract ("contract") signed by one or more buyers ("Buyer"), SELLER represents and warrants that: (1) Buyer's credit statement submitted herewith is completely accurate unless otherwise specified; (2) Buyer is legally competent to contract at the time of Buyer's execution of this contract; (3) this contract arose from the bona fide sale of the merchandise described in this contract; (4) the downpayment was made by Buyer in cash unless otherwise specified and no part thereof was loaned directly or indirectly by Seller to Buyer; (5) any trade-in, or other consideration, received as any part of the downpayment is accurately described on page 2 and has been valued at its bona fide value, and any amount owed on such trade-in or other

property is accurately described on page 2 and has been paid off by Seller prior to or contemporaneously with the assignment of this contract to Creditor; (6) there is now owing on this contract the amount set forth herein; (7) this contract and any guaranty submitted in connection herewith is in all respects legally enforceable against each purported signatory thereof; (8) Seller has the right to assign this contract and thereby to convey good title to it; (9) in the event of any claim or defense asserted by any Buyer, or any heirs or assigns of Buyer, with respect to the Manufactured Home or other property or consideration transferred pursuant to this retail installment contract, Seller agrees that it will indemnify and hold Creditor harmless from all such claims and defenses as well as from all costs reasonably incurred by Creditor in connection therewith, including but not limited to reasonable attorney fees and court costs; and (10) in accordance with the Fair Credit Reporting Act, Seller has notified Buyer that this contract is to be submitted to Creditor.

For value received, Seller hereby assigns to Creditor all its rights, title and interest in this contract and the property which is the subject matter hereof and authorizes Creditor to do everything necessary to collect and discharge same. All the terms of any existing written agreements between Seller and Creditor governing the purchase of contracts are made a part hereof by reference, it being understood that Creditor relies upon the above warranties and upon said agreements in purchasing this contract.

This provision related to a 1994 agreement between appellant and appellee's predecessor in interest, Security Pacific Housing Services, a Division of Bank of America FSB, whereby appellee agreed to purchase retail installment contracts, security agreements, and the related promissory notes from appellant. That contract contained the following provisions:

4. With respect to each Account purchased by SPHS, Dealer represents, warrants and agrees that:

. . . .

b. the Account and each guaranty and/or additional collateral agreement in connect therewith shall be legally enforceable by SPHS as assignee against each purported signatory thereof;

. . . .

j. the manufactured home and related services have been furnished to the satisfaction of Customer and all obligations of warranty to Customer either express or implied have been and will continue to be fulfilled by Dealer.

5. As additional consideration for the purchase of any Account in accordance with the terms of this Agreement, Dealer agrees to repurchase upon demand of SPHS, any Account wherein the purchaser fails to pay SPHS by reason of breach of warranty, misrepresentation with respect to the equipment sold, or failure on the part of Dealer to provide adequate service regarding such manufactured home sold at retail.

6. In the event of breach of any one or more of the warranties set forth in Paragraph 4 or 5 above, or should Dealer fail to perform any obligations to SPHS under this Agreement, Dealer shall, upon demand, repurchase without warranty or representation, expressed or implied, any Account then owned by SPHS which is affected by such breach, and will promptly pay SPHS therefore [sic] the amount then remaining to be paid by the Customer thereunder less any unearned finance charge thereon; but such obligation on part of Dealer shall not preclude SPHS from enforcing, at SPHS's election, any other remedies available by reason of such breach. Upon such payment by Dealer, the applicable accounts shall upon written request be reassigned by SPHS to Dealer without recourse to SPHS.

7. Upon SPHS's request, and within thirty (30) days thereafter, Dealer shall repossess and transport, or make arrangements to repossess and transport, to a location designated by SPHS, collateral covered by Accounts in default and accept as reimbursement therefor a maximum amount of the actual out-of-pocket costs incurred. Dealer shall, at no cost to SPHS, store and protect such repossessed collateral until resold. Dealer agrees to resell repossessed collateral at SPHS's request at a price to be established by SPHS, in its sole discretion, and to accept as reimbursement therefor a maximum amount of 10% of the selling price. Dealer agrees to indemnify and save SPHS harmless from *any and all claims which may be made* upon SPHS in connection with, or as a result of, any efforts, or conduct by Dealer, or Dealer's agents, in endeavoring to obtain possession of any collateral, it being understood and agreed that any efforts, which Dealer or Dealer's agents may make shall be for Dealer's own benefit, at Dealer's risk, and not as an agent of SPHS. SPHS

shall have the sole right to commence collections on all Accounts and Dealer agrees not to accept the return of nor make any substitution of collateral except with SPHS's prior written consent.

8. Dealer shall indemnify and hold SPHS harmless for any and all claims, damages and costs (including attorney's fees) which may be made upon SPHS in connection with or as a result of, any breach by Dealer of any of the terms of this Agreement, or any claim which, if true or proven, would constitute such a breach, or by reason of Dealer's repossession of any manufactured home, whether such repossession is at the direction of SPHS or otherwise.

. . . .

14. Dealer's liabilities shall not be affected hereunder by any settlement, extension, forbearance, variation in terms, discharge, release of the obligations of buyer or any other person (by operation of law or otherwise) which SPHS may grant a buyer or any other person in connection with any account(s).

The contract between the Copelands and appellant was assigned to appellee, to whom the Copelands sent their payments. The home was delivered on May 16, 1997. Immediately after moving into the manufactured home, the Copelands found numerous defects with it. After unsuccessfully attempting to obtain satisfaction from appellant, the Copelands eventually stopped making their payments to appellee. On September 10, 1999, appellee sued the Copelands for the full balance due, $83,501.31, and requested "immediate possession to be made permanent on final judgment, for sale of the unit in conformity with the Uniform Commercial Code and judgment for the difference between the debt and amount produced, for costs, fees, and all other proper relief." In an attached affidavit, appellee's attorney stated that the value of the mobile home was approximately $67,159. In response, the Copelands asserted the defenses of set-off, fraud in the inducement, and breach of warranty. They filed a counterclaim against appellee and a "cross-claim" against appellant, revoking their acceptance of the mobile home; rescinding the contract; asserting misrepresentation, breach of warranty, and deceptive trade practices; and seeking damages. In its answer to the counterclaim, appellee asserted that it was entitled to "contribution or indemnity from others. . . ."

On December 8, 1999, the circuit judge entered an order awarding possession of the mobile home to appellee. In an amended complaint filed January 27, 2000, appellee stated that the mobile home had been repossessed and that the balance due, including repossession expenses, was $86,705.25.

On February 4, 2000, appellant filed a third-party complaint against Saturn. On November 22, 2000, appellee filed a cross-claim against appellant and Saturn, in which it stated:

> 7. McDonald mobile homes signed a Dealer's Agreement with BankAmerica Housing Services, attached hereto as Exhibit "A" and incorporated herein by this reference. This agreement states that McDonald agrees to indemnify and hold BankAmerica Housing Service[s] harmless from any and all claims, damages and costs, including attorney's fees, which may be made upon BankAmerica Housing Services in connection with or as a result of any breach by McDonald of any terms of the Dealer's Agreement; that the Dealer's Agreement defines a breach to include failure of the purchaser to BankAmerica Housing Services by reason of breach of warranty or failure on the part of the dealer to provide adequate service regarding such manufactured homes sold by McDonald.
>
> 8. BankAmerica Housing Services is entitled to Judgment over and against McDonald for indemnity for all claims, damages and costs, including attorney's fees, which Copelands may recover against BankAmerica Housing Services in this lawsuit, or Bank-America may demand repurchase of the Copelands' contract with BankAmerica, which is affected by any breach on the part of McDonald.

In an amended counterclaim and cross-claim filed May 24, 2002, Mr. Copeland asserted that appellee, under the terms of the contract between the parties, was subject to each of the claims and defenses set forth therein, including rescission and cancellation.

The circuit judge severed the claims involving appellee, and Mr. Copeland's claims against appellant and Saturn were tried to a jury. The jury returned a verdict on interrogatories finding that the mobile home did not conform to express warranties given by appellant and Saturn and that Mr. Copeland had been damaged in the amount of $6550. The jury allocated forty percent of the total responsibility for the compensatory damages against appellant and sixty percent to Saturn. It awarded $10,000 in punitive damages

against appellant and $30,000 in punitive damages against Saturn. The court entered judgment on the verdict on June 27, 2002, and awarded an attorney's fee against appellant and Saturn in the amount of $9600. Appellant satisfied Mr. Copeland's judgment against it.

On July 10, 2002, the court entered an order stating that, upon mutual motions for voluntary nonsuit, all claims between the Copelands and appellee would be dismissed without prejudice. The court also denied appellant's motion to dismiss appellee's cross-claim and stated: "The Court further Orders that the cross-claim of BankAmerica Housing Services against McDonald Mobile Homes, Inc., d/b/a Harrison Home Center and Saturn Housing, LLC, remains pending and the Court, despite McDonald's objection, hereby severs the cross-claim for trial at a future date. This Order is entered Nunc Pro Tunc."

On July 23, 2002, appellee moved for summary judgment, stating that no appeal had been filed from the jury's verdict against McDonald and that, because of appellant's agreement to repurchase any account where the purchaser failed to pay appellee by reason of breach of warranty and/or misrepresentation, appellant was estopped to raise any defenses it might have with regard to those issues. Appellee requested judgment against appellant in the amount of $75,845.50, representing appellee's payments to Greentree Financial Services, the loan servicer, of $59,640 and to appellant of $16,205.50 for its equity. Appellee attached a copy of the jury's verdict on interrogatories and its agreement with appellant and argued that appellant's breach of warranty and material misrepresentations had been conclusively determined. In response, appellant contended that the motion for summary judgment should be denied because the only prayer for relief in appellee's cross-claim against it on November 22, 2000, sought no judgment for deficiency against appellant. It argued that there was

> simply no claim pending against this [appellant] for a deficiency judgment, or any other judgment, for that matter. The original claim was for indemnity as to any judgment that might be awarded AGAINST BankAmerica, but no indemnity could apply where Copeland dismissed all claims against BankAmerica. Therefore, no claim [is] presently pending against [appellant] and [appellee] is most certainly not entitled to a judgment, summary or otherwise, for damages it has not sought, pled, and proven.

On August 16, 2002, appellee amended its cross-complaint against appellant, stating:

1. That on September 1, 1994, [appellant] entered into a contractual agreement, whereby [appellant] agreed to repurchase customer's account in the event the customer failed to make payments to [appellee] by reason of breach of warranty and/or misrepresentation.

2. That [appellant], in the event of a determination of breach of warranty and/or misrepresentation, is obligated by contract to repurchase defendant Copeland's account with [appellee] in the amount of $75,845.50.

In its August 30, 2002 answer to the amended cross-complaint, appellant denied having entered into a contract as described by appellee and moved to dismiss for failure to state facts upon which relief could be granted. It also stated: "Further, the Amendment to Cross-Complaint seeks monetary judgment while seeking to enforce a specific agreement to repurchase a contract between [appellee] and [appellant], an opportunity that has never been given to [appellant]." Appellant also asserted laches and estoppel on the ground that appellee had failed to notify appellant of its actions in repossessing the collateral, holding it for sale, and selling it at public or private sale, or of any balance due, rendering it impossible for appellant to mitigate any possible damages by repurchasing the mobile home and using its expertise to sell it at a more reasonable price. Appellant stated that appellee had never asked it to repurchase the contract and, by failing to notify appellant of its actions, rendered it impossible for such a repurchase to occur. Appellant also alleged that appellee had failed to sell the collateral in a commercially reasonable manner in violation of the UCC and had sold it for less than its true market value. Additionally, appellant argued that, even if such a contractual relationship existed between the parties, appellee was under an obligation to mitigate its damages, which it had failed to do by settling with Mr. Copeland.

On June 23, 2003, appellee filed a second amended cross-claim, stating:

6. The Retail Installment Contract contains an Assignment by Seller wherein the Seller, McDonald, agrees to indemnify the Creditor, BankAmerica, from all claims asserted by the buyer and

defenses as well as from all costs reasonably incurred by BankAmerica in connection therewith, including attorney fees.

7. [Appellant], in the event of a determination of breach of warranty and/or misrepresentation, is obligated by contract to repurchase Defendant Copeland's account with BankAmerica Housing Services in the amount of $75,845.50.

The same day, appellee filed an amended motion for summary judgment on the basis of appellant's agreement to repurchase following the buyer's breach and to indemnify appellee from all claims and defenses asserted by the buyer.

In its July 10, 2003 answer to the second amended cross-complaint, appellant again moved to dismiss for failure to state facts upon which relief could be granted. It alleged that the manufactured home time sales agreement was, at least as interpreted by appellee, unconscionable because appellee had repossessed the mobile home with no notice to appellant or any request that appellant repurchase it. In response to the amended motion for summary judgment, appellant argued that appellee had failed to mitigate its damages, sell the collateral in a commercially reasonable manner, or give appellant the opportunity to repurchase the contract. Appellant also contended that appellee's voluntary dismissal of its claims against the Copelands barred a judgment against appellant.

This case was tried to the circuit judge, who entered judgment for appellee in the amount of $60,360.11 on February 11, 2004. Appellant filed its first notice of appeal on February 25, 2004. On February 9, 2005, we dismissed the appeal because the claims involving Saturn had not been determined. On March 18, 2005, the circuit court dismissed appellee's cross-claim against Saturn without prejudice, thereby solving the finality issue. On April 6, 2005, appellant filed its second notice of appeal.

When reviewing a judgment entered by a circuit judge after a bench trial, we will not reverse unless we determine that the circuit judge erred as a matter of law or we decide that his findings are clearly against the preponderance of the evidence. *Taylor v. George*, 92 Ark. App. 264, 212 S.W.3d 17 (2005). Disputed facts and the determination of the credibility of witnesses are within the province of the circuit judge, sitting as the trier of fact. *Id.*

Appellant does not dispute that it breached its warranties to the Copelands but raises the following points on appeal: (1) the

trial judge erred in refusing to dismiss appellee's cross-claim against appellant after appellee and Mr. Copeland nonsuited their claims against each other; (2) the trial judge erred in failing to find that appellee's recovery was barred because it failed to notify appellant of the sale and to sell the collateral in a commercially reasonable manner; (3) as interpreted by the trial judge, the contract between appellant and appellee was unconscionable. Because of our disposition of the first and second points on appeal, we need not reach appellant's third point.

Appellant first argues that, after appellee and Mr. Copeland dismissed their claims against each other, the trial judge should have dismissed appellee's claim against appellant. It asserts that appellee had only prayed for indemnity in the event that Mr. Copeland obtained a judgment against it, and after those claims were dismissed, appellee could no longer be considered a co-party within the meaning of Ark. R. Civ. P. 13(g), which states: "[P]ersons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20 [which concern the joinder of parties]."

We disagree with appellant. Appellee's cross-claim also recited that appellee might demand that appellant repurchase the contract. Instead of dismissing appellee's claim against appellant, the trial judge severed it for trial at a later date, as permitted by Ark. R. Civ. P. 18(b)(1), which provides: "Any claim against a party may be severed and proceeded with separately." Also, Ark. R. Civ. P. 42(b) states that, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, the judge may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue. The trial judge has extensive discretion in deciding whether to order severance of claims or issues. *Carpetland of N.W. Ark., Inc. v. Howard*, 304 Ark. 420, 803 S.W.2d 512 (1991). Additionally, appellee later amended its cross-claim to include a request that appellant repurchase Mr. Copeland's account in the amount of $75,845.50. Ark. R. Civ. P. 15 vests broad discretion in the trial judge to permit amendments to pleadings and the exercise of that discretion by the trial judge will be sustained unless it is manifestly abused. *Wingfield v. Page*, 278 Ark. 276, 644 S.W.2d 940 (1983). We cannot say that the circuit judge abused his discretion in this matter.

Appellant's second argument, however, is more persuasive. It asserts that the trial judge erred in refusing to apply the UCC and that appellee's failure to notify it of the sale of the collateral and its failure to prove that the sale was commercially reasonable should have barred its right to recover any deficiency from appellant. Because the sale of the collateral occurred on March 12, 2001, we refer to the statutes that were in effect on that date. Arkansas Code Annotated section 4-9-501 (Repl. 1991) provides:

> (1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose, or otherwise enforce the security interest by any available judicial procedure.... The rights and remedies referred to in this subsection are cumulative.
>
> . . . .
>
> (3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (§ 4-9-504 and § 4-9-505), and with respect to redemption of collateral (§ 4-9-506), but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:
>
> (a) Section 4-9-502(2) and § 4-9-504(2) insofar as they require accounting for surplus proceeds of collateral;
>
> (b) Section 4-9-504(3) and § 4-9-505(1) which deal with disposition of collateral;
>
> (c) Section 4-9-505(2) which deals with acceptance of collateral as discharge of obligation;
>
> (d) Section 4-9-506 which deals with redemption of collateral; and
>
> (e) Section 4-9-507(1) which deals with the secured party's liability for failure to comply with this part.

It is apparent that section 4-9-501(3) limits the parties' freedom of contract. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 34-1 (4th ed. 1995).

Arkansas Code Annotated section 4-9-504 (Repl. 1991) states in relevant part:

(1) A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.

. . . .

(3) Disposition of the collateral may be by public or private proceeding and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods, no other notification need be sent. In other cases, notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations, he may buy at private sale.

Under the UCC, once the collateral has been disposed of, the debtor remains liable for any deficiency. Ark. Code Ann. § 4-9-504(2) (Repl. 1991); *Greenlee v. Mazda Am. Credit*, 92 Ark. App. 400, 214 S.W.3d 290 (2005). However, a creditor may be barred from seeking a deficiency judgment if the sale of the collateral was not commercially reasonable. *Id.* The creditor bears the burden of proving that the sale proceeded in a commercially reasonable manner. *Id.* Whether the sale of collateral was conducted in a commercially reasonable manner is essentially a factual question. *Id.* It is recognized that a seller of chattel paper with recourse has a financial stake in the creditor's disposition or sale of

the collateral that is similar to the debtor's possible liability for a deficiency. James J. White & Robert S. Summers, *Uniform Commercial Code* § 34-13 (4th ed. 1995). For example, in *City Nat'l Bank of Fort Smith v. Unique Structures, Inc.*, 49 F.3d 1330 (8th Cir. 1995), the Court of Appeals held that a mobile home dealer that had sold installment contracts "with recourse," thereby assuming liability for payment in the event of default by the buyer, did not have to pay a deficiency to the bank because the bank failed to prove that its sales of the collateral were commercially reasonable.

In *Norton v. Nat'l Bank of Commerce of Pine Bluff*, 240 Ark. 143, 398 S.W.2d 538 (1966), *overruled on other grounds, First State Bank of Morrilton v. Hallett*, 291 Ark. 37, 722 S.W.2d 555 (1987), the Arkansas Supreme Court held that a car dealer was a "debtor" within the meaning of Ark. Stat. Ann. § 85-9-504(3) (now found in section 4-9-504) and, therefore, entitled to notice of the sale of collateral.[1] The car dealer took a note and conditional sales contract from a buyer and assigned it to a bank, promising that it would repurchase the note and contract if the buyer defaulted. After the buyer defaulted, the bank sold the car without notice to the dealer. The supreme court held that the dealer was one who, under the statute, was a debtor and, because the amount obtained in the sale fixed his pecuniary liability, was entitled to notice as a matter of simple fairness. The court also held as ineffective under Ark. Stat. Ann. § 85-9-501(3) Norton's purported waiver of his right to notice of the sale by signing a printed assignment of the conditional sales contract (prepared by the bank) that recited that Norton waived all notices to which he might otherwise have been entitled. Based on that statute and the court's interpretation of it in *Norton*, we hold that the trial judge in this case was wrong in concluding that appellee was not required to follow the UCC and sell the collateral in a commercially reasonable manner.

Under Arkansas law, inadequacy of sale price, alone, is not dispositive of whether a sale was commercially reasonable. *Greenlee v. Mazda Am. Credit, supra.* However, a large discrepancy between the sale price and fair market value of the collateral signals the need for close scrutiny of the sale procedures. *Id.* The trial court is

---

[1] Arkansas Code Annotated section 4-9-105(1)(d) (Supp. 1999) defines "debtor" as: "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper."

required to consider evidence regarding the reasonableness of the method, time, manner, and place of the disposition of the collateral. *Id.* Commercial reasonableness requires that the secured party act in good faith to maximize returns on collateral. *Eagle Bank & Trust Co. v. Dixon*, 70 Ark. App. 146, 15 S.W.3d 695 (2000). Testimony by a witness without personal knowledge of the activities surrounding the sale or disposition of the property is not sufficient. In *Greenlee*, the creditor submitted no evidence of the value of the collateral, its condition, or the manner of the sale, other than the statement contained in a computer printout that the disposition had occurred at an "auction," or how the sale was advertised, and we reversed the trial court's award of a deficiency judgment. Although appellee presented evidence of its usual procedure, which included sending notice to dealers, it offered no information about the advertising or solicitation of bids, the value of the collateral, or whether appellant was actually notified about the sale. Because *Norton*, and thus the UCC, apply to this case, appellee was required to demonstrate that the sale was commercially reasonable. However, the trial judge did not make any findings on whether the sale was commercially reasonable because he erroneously believed that the UCC did not apply in this situation. We therefore reverse and remand this case for further proceedings on the issue of whether the sale was commercially reasonable.

Reversed and remanded.

NEAL and VAUGHT, JJ., agree.