**Shannon P. HICKLIN, Defendant Below, Appellant,**

v.

**ONYX ACCEPTANCE CORP., Plaintiff Below, Appellee.**

No. 317, 2008.

Supreme Court of Delaware.

Submitted: Jan. 14, 2009.
Decided: March 27, 2009.
Reargument Denied: April 22, 2009.

---

36. *See Stone* at 369.

38. *Lyondell I* at *8.

Douglas A. Shachtman, Esquire, Douglas A. Shachtman & Associates, Wilmington, for Appellant.

Jeffrey P. Wasserman and Daniel C. Kerrick (argued), Esquires, of Ciconte, Wasserman & Scerba, LLC, Wilmington, for Appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

JACOBS, Justice:

Shannon P. Hicklin, the defendant below, appeals from a Superior Court order affirming a deficiency judgment of the Court of Common Pleas arising from the repossession and sale of a car financed by the plaintiff below, Onyx Acceptance Corporation ("Onyx"). On appeal, Hicklin argues that the Superior Court erroneously upheld the judgment of the Court of Common Pleas, because the trial court: (1) applied an incorrect standard in determining the commercial reasonableness of a sale after repossession, and (2) improperly admitted hearsay evidence. Hicklin also claims statutory damages for Onyx's alleged violation of the Delaware Uniform Commercial Code ("UCC"). We conclude that the trial court erroneously applied the UCC commercial reasonableness standard, that the trial court did not abuse its discretion in admitting hearsay evidence, and that Hicklin is not entitled to statutory damages. We therefore affirm in part and reverse in part the Superior Court order affirming the judgment of the Court of Common Pleas.

## FACTUAL AND PROCEDURAL BACKGROUND [1]

On July 6, 2000, Hicklin purchased a 1993 Ford Explorer (the "car") under an installment sales contract. Payments under that contract were assigned to Onyx. Hicklin fell behind on her payments, and on February 11, 2004, Onyx repossessed the car. At that time, Hicklin was three payments past due and owed $5,741.65 under the contract.

The car, when repossessed, had minor defects—including a cracked windshield, dings, scratches, and a "check engine" message—that would cost an estimated $1,365 to repair. Those defects were never repaired. According to the Kelley Blue Book, the average wholesale price of a 1993 Ford Explorer at that time was $3,700.[2]

The repossessed car was driven to Dulles, Virginia and sold for $1,500 at a private auction operated by ABC Washington–Dulles, LLC ("ABC"). After deducting the sale proceeds from the costs of repossession and sale and the contract balance, there remained a deficiency of $5,018.88. Onyx sued Hicklin in the Court of Common Pleas to collect that deficiency. Hicklin denied liability and counterclaimed for statutory damages under 6 Del. C. § 9–625(c), on the ground that Onyx had failed to sell the car in a commercially reasonable manner as the UCC required.

Onyx's only witness at trial was Cesar Jimenez, an employee who worked in Onyx's Philadelphia office. Onyx is headquartered and maintains its records in Cal-

---

1. The facts are summarized from the decisions below: *Hicklin v. Onyx Acceptance Corp.*, C.A. 07A–09–004 (Del.Super. June 2, 2008), also available at 2008 WL 2690284; and *Hicklin v. Onyx Acceptance Corp.*, (Del. Com.Pl. May 23, 2007) C.A.2005–10–062.

2. Because the actual mileage on the car was disputed, its Blue Book value may possibly have been higher. At the time Hicklin purchased the car, the certificate of title listed the car's mileage as 84,030. The odometer reading at the time of sale, however, was 57,708. If the mileage on the car were that lesser figure, it would be worth $450 more.

ifornia. Jimenez had worked for Onyx for 10 years, during which time he underwrote loans, made credit decisions, collected delinquent accounts and assigned delinquent accounts for repossession. At trial, Jimenez testified that Onyx sells its repossessed cars at private auction, because private auctions result in higher sale prices. Jimenez also authenticated several documents, including the repossession notice and reports describing the condition of Hicklin's repossessed car.

The Court of Common Pleas found that the fair market value of the car at the time of the sale was $2,335, using the higher of the two disputed mileage figures to determine the wholesale value, and then subtracting the repair costs. The court held that because the $1,500 auction price was greater than 50% of the car's adjudicated value, the sale was commercially reasonable. Consequently, the trial court ruled, Hicklin remained liable for Onyx's deficiency and was not entitled to statutory damages.

Hicklin timely appealed that judgment to the Superior Court. Hicklin claimed that the trial court had erroneously applied the common law "shock the conscience," rather than the UCC commercial reasonableness, standard. Hicklin also argued that the trial court misapplied the "business records exception" of D.R.E. 803(6), when admitting into evidence various documents offered by Onyx. Specifically, Hicklin claims that the trial court erroneously credited the authentication of those documents by Jimenez, who was not their custodian. Rejecting these arguments, the Superior Court held that the trial court had not relied solely on the 50% "shock the conscience" test, but also had considered Jimenez's testimony, the documentary evidence, and the inaccurate odometer reading, to conclude that the sale was commercially reasonable. On that basis, the Superior Court affirmed the judgment of the Court of Common Pleas. This appeal followed.

## ANALYSIS

### I.

■■■ On appeal from the Court of Common Pleas to the Superior Court, the standard of review is whether there is legal error, whether the trial court's factual findings are sufficiently supported by the record, and whether those findings are the product of an orderly and logical reasoning process.[3] Factual findings of the Court of Common Pleas that are supported by the record will be upheld even if, acting independently, the Superior Court would have reached a contrary result.[4] On further appeal to this Court we apply the same standard[5] in reviewing independently the underlying decision of the Court of Common Pleas.[6]

Applying a presumption that repossession sales that recover over 50% of a vehicle's value are commercially reasonable, the trial court granted Onyx a deficiency judgment. On appeal, Hicklin claims that:

3. *Wright v. Platinum Fin. Servs.*, 930 A.2d 929 (Table) (Order), 2007 WL 1850904, at *2 (Del. June 28, 2007) (citing *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del.1972)).

4. *Id.*

5. *See, e.g., Onkeo v. State*, 957 A.2d 2 (Table) (Order), 2008 WL 3906076 (Del. Aug. 26, 2008) (citing *Baker v. Connell*, 488 A.2d 1303, 1309 (Del.1985)).

6. *See Tony Ashburn & Son, Inc. v. Kent County Reg'l Planning Comm'n*, 962 A.2d 235, 239 (Del.2008) (holding that where the Superior Court exercises appellate review over a decision of an administrative agency, our review is of the underlying agency decision); *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66 (Del. 1965) (same).

(1) the trial court erred in applying the common law "shock the conscience" test rather than the UCC "commercial reasonableness" test, and that (2) Onyx failed to meet its burden of proving a commercially reasonable disposition of the collateral. Hicklin urges that Onyx did not establish that the auction was commercially reasonable, because Onyx failed to: (a) introduce evidence of the prevailing practice in disposing of repossessed automobiles, or (b) show that the time, place and manner of the sale were commercially reasonable.

Onyx responds that the trial court properly applied the commercial reasonableness test, and that Onyx adequately proved that it had sold the car in a commercially reasonable manner. Onyx contends that the commercial reasonableness test is flexible and permits a secured creditor, acting in good faith, to exercise business judgment and flexibility in deciding how to dispose of collateral. Onyx further argues that it was not required to introduce evidence of the prevailing trade practice in disposing of repossessed automobiles, and that even without such evidence, it established that the time, place, and manner of the sale were commercially reasonable.

This appeal raises two issues. The first is what is a commercially reasonable disposition under the UCC, and how may a party prove commercial reasonableness. The second is what consequence flows from a secured party's failure to establish a commercially reasonable disposition of collateral. For the reasons next discussed, we conclude that: (1) the trial court applied an erroneous commercial reasonableness standard, (2) Onyx failed to adduce sufficient evidence to establish a commer-

cially reasonable sale of Hicklin's car, (3) Onyx's failure to establish commercial reasonableness bars it from recovering any deficiency, (4) the trial court did not err in admitting certain documents into evidence, and that (5) Hicklin is not entitled to statutory damages.

## II. The Courts Below Applied An Erroneous Commercial Reasonableness Standard

Because this dispute concerns a security interest in personal property, it is governed by Article 9 of the UCC.[7] Section 9–610 of the UCC (6 *Del. C.* § 9–610) states the general rule governing the disposition of collateral:

(a) After default, a secured party may ... dispose of ... the collateral in its present condition or following any commercially reasonable preparation....

(b) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable....

██ The UCC does not specifically define the term "commercially reasonable."[8] Whether or not a secured party's disposition of collateral action was commercially reasonable must be considered on a case by case basis. Comment 2 to 6 *Del. C.* § 9–610 states that "[s]ection 9–627 provides guidance for determining the circumstances under which a disposition is 'commercially reasonable.'" Sections 9–627(b) and (c), in turn, provide the following "safe harbors" that are deemed to establish conclusively that a secured party acted in a commercially reasonable manner under Section 9–610:

---

7.   6 *Del. C.* § 9–101 *et. seq.*

8.   *Assocs. Fin. Servs. Co., Inc. v. DiMarco*, 383 A.2d 296, 302 (Del.Super.1978) (overruled on other grounds by *Wilmington Trust Co. v.*

*Conner*, 415 A.2d 773 (Del.1980)) (describing the commercial reasonableness standard as imprecise).

(b) A disposition of collateral is made in a commercially reasonable manner if the disposition is made:

(1) in the usual manner on any recognized market;

(2) at the current price in any recognized market at the time of disposition; or

(3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

(c) A ... disposition ... is commercially reasonable if it has been approved:

(1) in a judicial proceeding;

(2) by a bona fide creditors' committee;

(3) by a representative of creditors; or

(4) by an assignee for the benefit of creditors.

Our prior case law has articulated a standard substantially similar to the one established by Section 9–627(b)(3):

To be commercially reasonable the actions must be "in keeping with prevailing trade practice among reputable and responsible business and commercial enterprises engaged in the same or similar businesses." [9]

The only safe harbor provision applicable here would be proof of "conformity with reasonable commercial practice among dealers in the type of property that was the subject of the disposition." [10] The reason is that auctions of the kind at issue here are not "recognized markets" in which sales are conclusively deemed commercially reasonable.[11]

Onyx could prove that its sale of Hicklin's car was commercially reasonable under 6 *Del. C.* § 9–610(a) in one of two ways. First, it could show that every aspect of the sale was conducted in a commercially reasonable manner, as Section 9–610(b) prescribes. Second, it could take advantage of the Section 9–627(b)(3) safe harbor applicable here, by showing that it sold the car in accordance with the accepted practices of reputable dealers in that type of property.[12] Because showing conformity with the practices of reputable dealers in the trade conclusively establishes commercial reasonableness,[13] secured parties often utilize that safe harbor. Where they do not, secured parties must meet the burden of showing that every aspect of the sale is "commercially reasonable"—a burden that requires the secured party to establish considerably more than that a presumptively fair price for the collateral was obtained.

---

**9.** *DiMarco*, 383 A.2d at 300 (citing Anderson Uniform Commercial Code, § 9–504–10, p. 613). *DiMarco* interpreted former Article 9. Delaware adopted Revised Article 9 in July of 2001.

**10.** 6 *Del. C.* § 9–627(b)(3).

**11.** *See* 6 *Del. C.* § 9–610 cmt. 9 ("A market in which prices are individually negotiated or the items are not fungible is not a recognized market, even if the items are the subject of widely disseminated price guides or are disposed of through dealer auctions."); *see also* 6 *Del. C.* § 9–627 cmt. 4.

**12.** 6 *Del. C.* § 9–627(b)(3) "does not allow the dealers in an industry to set their own low standards. The practices must be reasonable among reputable dealers. The burden of proof is on the secured party to prove that these conditions are met." *See* Anderson, Uniform Commercial Code, [Rev] § 9–627:5, p. 1056.

**13.** *See* Anderson, Uniform Commercial Code, [Rev] § 9–627:5, p. 1056 ("if the secured party acts in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition, the secured party is conclusively presumed to have conducted the disposition in a commercially reasonable manner.")

## A. Onyx Failed to Prove the Sale of Hicklin's Car Was Commercially Reasonable in Every Aspect

■ The UCC affords secured parties greater rights than those available at common law—the ability both to repossess collateral and to sue for a judgment on the underlying obligation—rather than having to elect between those remedies. The UCC also requires the secured party to meet a high standard when disposing of collateral.[14] Although obtaining a satisfactory price is the purpose of requiring a secured party to resell collateral in a commercially reasonable way, price is only one aspect.[15] It is improper to reason backwards from price alone to determine the commercial reasonableness of the overall sale process.[16] Because *every aspect* of a sale must be "commercially reasonable," showing that the sale grossed over 50% of the collateral's value, without more, will not establish the secured party's compliance with 6 *Del. C.* § 9–610(b).[17] Therefore, the Court of Common Pleas (and, on appeal, the Superior Court) reversibly erred by holding that the sale of Hicklin's car for over 50% of its adjudicated fair market value, without more, was "commercially reasonable."

Onyx argues that a recovery of more than 50% of fair market value should establish "commercial reasonableness," citing Court of Common Pleas precedent adopting that presumption.[18] Because those cases are inconsistent with the plain language of the UCC, they are not sound law and we overrule them.

Onyx next argues that even if the trial court made an error of law, the evidence nonetheless sufficiently establishes that Onyx sold Hicklin's car in a commercially reasonable manner. Onyx argues that private auctions generally yield higher prices, and that because Hicklin's car was sold to the highest bidder at a private auction, the sale must have perforce been "commercially reasonable." We disagree. Even if private auctions *generally* result in higher sales prices than other methods, there is no evidence that the *specific* auction procedures employed by ABC here would have resulted in higher prices. To illustrate, the sale of a car to the highest bidder at a poorly publicized, sparsely attended, and

---

14. Under the UCC, a secured party may repossess collateral and seek a deficiency judgment, but under common law, the secured party had to choose between repossessing the collateral and suing on the underlying note. *See Connor*, 415 A.2d at 780.

15. *See* White and Summers, The Uniform Commercial Code, Fifth Edition § 34–11, p. 401.

16. *Id.*

17. Nor should that presumption of commercial reasonableness always attach. In some circumstances a commercially reasonable sale should recover a greater portion of the collateral's value, and in other cases, such a sale would recover a lesser portion. Assuming that proper sale procedures are followed, a variance in price is not determinative of the sale's propriety.

18. *See, e.g., Wilmington Trust Co. v. Negron*, 1994 WL 1547768, at *2 (Del.Com.Pl. April 20, 1994); *Friendly Fin. Corp. v. Hector*, 1999 WL 1847444, at *1 (Del.Com.Pl. March 15, 1999). It is unclear why the Court of Common Pleas adopted that presumption. The application of the 50% "shock the conscience standard" to determinations of commercial reasonableness under the UCC apparently originated in *Matter of MacDonald v. First Interstate Credit Alliance, Inc.*, 100 B.R. 714, 717 (Bankr.Del.1989).

The *MacDonald* court relied on several Delaware cases dealing with sheriff's sales of real property, and extended the 50% rule to cover the sale of repossessed collateral. That confusion of Article 9 security interests and non-UCC real property security interests appears to be the source of the misapplication of the commercial reasonableness standard to the disposition of property under the UCC.

inconveniently located auction would not be meaningful;[19] but a sale to the highest bidder at a highly-publicized, well-attended auction run by a highly-regarded auctioneer in a convenient location would be. Onyx has failed to adduce any evidence that would permit a fact-finder to determine whether the ABC auction represented the former or the latter kind of auction. Without proof of the specific auction procedures that were followed, a secured party cannot satisfy its burden of establishing commercial reasonableness.[20]

### B. Onyx Has Failed to Establish That Its Sale of the Car Conformed With Accepted Trade Practice

Nor has Onyx proved commercial reasonableness by establishing conformity with accepted practices in the trade. Onyx argues that 6 *Del. C.* § 9–610(b) does not *require* it to prove conformity with prevailing trade practices. That is true but of no help to Onyx. To be sure, Section 9–627(b)(3), which provides that sales which conform to accepted trade practice are commercially reasonable, is not the exclusive way to prove commercial reasonableness. Accordingly, Onyx was not required to introduce any evidence of practice in the trade. But, without such evidence, Onyx cannot avail itself of that UCC provision to prove a commercially reasonable sale of Hicklin's car.

### C. Onyx's Good Faith Does Not Establish the Commercial Reasonableness of the Sale

■ Onyx next implies, without directly arguing, that because it acted in good faith when it sold Hicklin's car, the sale was commercially reasonable, or alternatively, was a substantial factor that the court could consider in evaluating commercial reasonableness. That contention fails to take into account 6 *Del. C.* § 1–304, which provides that "[e]very contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement." Good faith is a bedrock minimum standard that all secured parties must satisfy. Article 9 goes beyond that, by imposing a higher standard—commercial reasonableness. A secured party's failure to act in good faith may evidence a lack of commercial reasonableness, but the converse is not necessarily true. That is, a showing of good faith in selling repossessed collateral, without more, cannot establish the commercial reasonableness of the method, manner, time, place, and other terms of that sale.

### III. Onyx's Failure to Establish a Commercially Reasonable Sale of the Collateral Bars a Recovery of Any Deficiency

■ The parties do not directly address another critical issue—the conse-

19. *See, e.g., First Heritage Nat. Bank v. Keith,* 902 F.2d 33 (Table), 1990 WL 51417, at *4 (6th Cir. April 24, 1990) (stating that a sale of collateral at public auction is not conclusive proof of commercial reasonableness) (citations omitted). Auctions are not "recognized markets" where sales are conclusively deemed commercially reasonable. *See* 6 *Del. C.* § 9–610 cmt. 9 ("A market in which prices are individually negotiated or the items are not fungible is not a recognized market, even if the items are the subject of widely disseminated price guides or are disposed of through dealer auctions."); *see also* 6 *Del. C.* § 9–627 cmt. 4.

20. *See, e.g., Ford Motor Credit Co. v. Henson,* 34 S.W.3d 448, 450 (Mo.App.2001) (holding that a secured party who fails to provide information on the method, manner, or place of sale has failed to establish a commercially reasonable disposition of collateral.); *McDonald Mobile Homes, Inc. v. BankAmerica Housing Servs.,* 93 Ark.App. 256, 218 S.W.3d 376, 386 (2005) (holding that a secured party who stated only that collateral was sold at auction had failed to establish commercial reasonableness). *See also* Clark, Secured Transactions Under the Uniform Commercial Code p. 4–54, ¶ 4.8[5][b].

quence of a secured party's failure to establish a commercially reasonable sale of collateral. Hicklin asserts, but without making any reasoned argument, that such a failure bars a recovery of any deficiency, and Onyx does not address the issue at all. We hold that a secured party's failure to establish a commercially reasonable sale of repossessed consumer collateral bars it from recovering any deficiency.

The UCC establishes a rebuttable presumption that secured parties in non-consumer transactions are entitled to deficiency judgments, even if they fail to comply with other provisions of Article 9.[21] That presumption, however, does not apply here, because Hicklin bought her car in a consumer transaction.[22] 6 *Del. C.* § 9–626(b) states:

> The limitation of the rules in subsection (a) [adopting the rebuttable presumption rule] to transactions other than consumer transactions is intended to leave to the court the determination of the proper rules in consumer transactions. *The court may not infer from that limitation the nature of the proper rule in consumer transactions and may contin-*

*ue to apply established approaches.* (emphasis added).

Delaware adopted revised Article 9 on July 1, 2001. The former Article 9 did not directly address the consequence of a secured party's failure to comply with its provisions.[23] Delaware case law, however, held that a failure to comply with the notice provisions of Article 9 created an absolute bar to the secured party recovering a deficiency.[24] In a 1980 decision, this Court adopted the absolute bar rule in the context of deficient notice, for the policy reason that proper notice of the sale of collateral enables a debtor to ensure that the secured party follows procedures designed to yield the highest available sale price.[25] Those same policy concerns are applicable in this case and under Article 9 in its current form, where the secured party has failed to establish that it sold the collateral in a commercially reasonable manner. We therefore hold that a secured party's failure to prove a commercially reasonable disposition of repossessed consumer goods will absolutely bar a recovery of any deficiency. Accordingly, the entry of a deficiency judgment in Onyx's favor

---

**21.** 6 *Del.* C. § 9–626(a).

**22.** 6 *Del.* C. § 9–102(a)(23) defines consumer goods as goods "bought for use primarily for personal, family, or household purposes." Hicklin bought her car for personal use.

**23.** *See* Anderson, Uniform Commercial Code [Rev] § 9–626:4, p. 1048 (describing how under former Section 9–507 there was a three-way split of authority on the consequences of a secured party's failure to comply with Article 9: the "absolute bar," "rebuttable presumption," and "setoff" rules. Under the absolute bar rule, a secured party could not recovery any deficiency. Under the rebuttable presumption rule, the value of the repossessed collateral was presumed to equal the debtor's liability, unless the secured party proved otherwise. Under the set-off rule, any damages the debtor could prove were deducted from the deficiency.)

**24.** *See Wilmington Trust Co. v. Conner*, 415 A.2d 773, 780–81 (Del.1980). In *Conner*, this Court held that the secured party's failure to provide proper notice of the sale of collateral to the debtor creates an absolute bar to recovery. Noting that the secured party "enjoy[ed] a position of domination and control," and the debtor was in a "subordinate position [and] in need of protection," the Court reasoned that a debtor who received proper notice of the sale of collateral could monitor that sale to ensure the secured party followed proper procedures to obtain the greatest recovery possible. Allowing the debtor to monitor the secured party's efforts would ensure a higher sale price, and reduce or eliminate any potential deficiency.

**25.** *Id.*

(and its affirmance by the Superior Court) cannot stand.

## IV. Hicklin's Claims of Evidentiary Error

Hicklin's second claim of error is evidentiary. The Court of Common Pleas allowed Jimenez, a non-custodial Onyx employee, to lay a foundation for admitting certain business records—prepared both by Onyx staff and by outside contractors retained by Onyx—as business records under D.R.E. 803(6). The Superior Court affirmed that ruling. On appeal, Hicklin argues, *inter alia,* that because Jimenez—an employee in Onyx's Philadelphia office—was not the custodian of the business records maintained at Onyx's corporate headquarters in California, he was not qualified to establish the foundation required to authenticate those documents as business records for Rule 803(6) purposes. Onyx argues that because Jimenez had worked for Onyx for ten years in several different capacities, he could properly authenticate those documents under D.R.E. 803(6) as an "other qualified witness." Alternatively (Onyx argues) even if those records were erroneously admitted, substantial evidence supports the trial court's evidentiary ruling.

■ Because we conclude that the trial court erred as a matter of law by granting Onyx a deficiency judgment, and reverse the Superior Court's affirmance on that basis, we address Hicklin's evidentiary claim only insofar as is necessary to decide her counterclaim for statutory damages. We review a trial court's evidentiary rulings for abuse of discretion.[26]

D.R.E. 803(6) provides, in relevant part: A ... record ... kept in the course of a regularly conducted business activity ... as shown by the testimony of the custodian or other qualified witness ... [is admissible hearsay].

■ The trial judge ruled that Jimenez was a qualified authenticating witness, because he had worked for Onyx for over ten years, and had underwritten loans, made credit decisions, and assigned delinquent accounts for repossession. Although Hicklin argues that Jimenez was not the document's custodian, she is unable to articulate precisely how the trial court abused its discretion in finding Jimenez to be an "other qualified witness." We conclude that Jimenez's employment history with Onyx was a sufficient basis for the trial court to find (and that the court committed no abuse of discretion in finding) that Jimenez was qualified to authenticate the repossession notice.

## V. Hicklin is Not Entitled to Statutory Damages On Remand

The final issue concerns Hicklin's counterclaim for statutory damages based on Onyx's alleged breach of the notice provisions of 6 *Del. C.* § 9–611. The Superior Court held that Hicklin had failed to offer any support for her counterclaim, and affirmed the trial court's rejection of it. On appeal to this Court, Hicklin again argues that Onyx's breach of Article 9's notice provisions entitles her to statutory damages under 6 *Del. C.* § 9–625(c). Onyx responds that because it gave Hicklin proper statutory notice, she is not entitled to statutory damages.

■ We agree that Hicklin's statutory damages claim lacks merit. Hicklin's argument—that Onyx breached the notice requirements of 6 *Del. C.* § 9–611, by failing to send a proper repossession notice—rests on her claim that the repossession notice was not properly authenticated by

**26.** *Sammons v. Doctors for Emergency Servs.,* *P.A.,* 913 A.2d 519, 535 (Del.2006).

Jimenez. Hicklin does not contend that the repossession notice was substantively deficient. Because we have concluded that the notice was properly authenticated and admitted into evidence, Hicklin's claim for statutory damages fails.

### CONCLUSION

For the foregoing reasons, the Superior Court's order affirming the judgment of the Court of Common Pleas is: (1) affirmed, insofar as it upholds the dismissal of Hicklin's counterclaim for statutory damages, and (2) reversed insofar as it affirms the deficiency judgment entered in favor of Onyx. The case is remanded to the Superior Court, with instructions to remand it to the Court of Common Pleas, for proceedings consistent with this Opinion.